# "EXHIBIT 1"

## PROPOSED SECOND AMENDED COMPLAINT

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **DR. MARIE N. FEAGINS,**<br><br>*Plaintiff,*<br><br>v.<br><br>**SHELBY COUNTY BOARD OF EDUCATION d/b/a MEMPHIS-SHELBY COUNTY SCHOOLS,**<br><br>*Defendant.* | CASE NO.: 2:26-cv-02292-BCL-atc<br><br>**JURY DEMAND** |

## SECOND AMENDED COMPLAINT

Plaintiff Dr. Marie N. Feagins ("Plaintiff" or "Dr. Feagins"), proceeding pro se, files this Second Amended Complaint against Defendant Shelby County Board of Education d/b/a Memphis-Shelby County Schools ("SCBOE" or "the Board") for sex discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964. This action arises from SCBOE's treatment of Dr. Feagins during her employment as Superintendent of Memphis–Shelby County Schools, the termination of her employment, the denial of severance and related employment benefits, and the public use of stigmatizing allegations in connection with and following her termination. Plaintiff demands trial by jury on all issues so triable.

## I. NATURE OF THE ACTION

1. Dr. Marie N. Feagins was recruited and hired to lead Memphis-Shelby County Schools ("MSCS") as Superintendent beginning April 1, 2024, under a multi-year employment contract with an annual base salary of approximately $325,000 plus benefits. This action arises

from SCBOE's discriminatory and retaliatory treatment of Dr. Feagins during her employment as Superintendent of Memphis–Shelby County Schools, the termination of her employment and denial of severance, and materially adverse conduct following her termination.

2. As Superintendent, Dr. Feagins was responsible for leading Tennessee's largest public-school system. During her tenure, Plaintiff alleges that certain Board members engaged in conduct that interfered with her authority, subjected her to heightened scrutiny and public undermining, and created hostile working conditions affecting her ability to perform her duties as Superintendent.

3. Plaintiff further alleges that certain Board members and aligned actors engaged in communications and activities outside ordinary performance, evaluation, or disciplinary processes concerning her removal. These actions included the circulation and public use of stigmatizing allegations, including allegations of a sexual nature, allegations of criminal conduct, allegations of financial mismanagement, allegations of academic or credentials-related misconduct, and other accusations impugning Plaintiff's honesty, integrity, and professional fitness. Plaintiff denies and disputes those allegations.

4. On January 21, 2025, the Board voted to terminate Plaintiff's employment for cause and denied her the severance and benefits available under her contract for a termination without cause. Plaintiff alleges that SCBOE reached and publicly prepared to announce that result before completing the response process it offered her and before considering the evidence later asserted to support termination.

5. Plaintiff alleges that she was treated differently because of her sex and in retaliation for protected activity. She further alleges that male Superintendent Dr. Joris Ray, who was placed on administrative leave, faced serious professional misconduct allegations and

a months-long investigation, was permitted to resign and negotiate favorable separation terms not offered to Plaintiff.

6. Plaintiff also alleges that SCBOE's actions caused significant economic and reputational harm, including harm resulting from the public dissemination and continued use of stigmatizing allegations and materially impaired her ability to obtain substantially equivalent employment.

7. Through this action, Plaintiff seeks monetary, declaratory, injunctive, and other relief available under Title VII.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

9. Venue is proper in the Western District of Tennessee under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged in this action were committed in this District, the employment records relevant to those practices are maintained and administered in this District, and Plaintiff would have continued working in this District but for the alleged unlawful employment practices.

10. The events giving rise to this action occurred primarily in Memphis, Shelby County, Tennessee, within the Western Division of the Western District of Tennessee.

## III. PARTIES

11. Plaintiff Dr. Marie N. Feagins is an individual who, at all relevant times, was employed as Superintendent of Memphis–Shelby County Schools.

12. Defendant Shelby County Board of Education ("SCBOE" or "the Board") is a local governmental entity doing business as Memphis–Shelby County Schools ("MSCS"), with

its principal office located at 160 South Hollywood Street, Memphis, Tennessee 38112.

13. At all relevant times, SCBOE was Plaintiff's employer within the meaning of Title VII of the Civil Rights Act of 1964.

## IV. ADMINISTRATIVE EXHAUSTION

14. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 490-2025-02915, alleging discrimination based on sex and retaliation.

15. On December 19, 2025, an EEOC email notification dated December 19, 2025 was delivered to fameuswoman@gmail.com, advising that the EEOC had issued a final decision and Notice of Right to Sue in connection with Charge No. 490-2025-02915. A true and correct copy of the December 19, 2025 EEOC electronic notice is attached hereto as Exhibit A.

16. This action was filed on March 19, 2026, within ninety (90) days of Plaintiff's December 19, 2025 receipt of the EEOC Notice of Right to Sue, and Plaintiff has satisfied all administrative prerequisites to filing suit under Title VII.

17. To the extent SCBOE contends that any earlier correspondence triggered the ninety-day filing period, Plaintiff denies that she received actual notice sufficient to trigger the ninety-day period before December 19, 2025. Plaintiff further alleges that the December 19, 2025 EEOC electronic notice is the operative notice received advising her of the right to file suit within ninety (90) days.

## V. FACTUAL ALLEGATIONS

18. After a national search, SCBOE selected Dr. Feagins to serve as Superintendent of MSCS. Dr. Feagins formally assumed the role on April 1, 2024.

19. Plaintiff's written employment agreement provided a four-year term ending March 31, 2028. The agreement permitted SCBOE to terminate Plaintiff without cause but required SCBOE to pay the lesser of eighteen months or the remaining contract term at Plaintiff's salary rate, together with specified benefits. Termination without further compensation was authorized only for cause upon proof of a material breach of the agreement, violation of Board policy, or violation of law. SCBOE terminated Plaintiff for cause and denied her the contractual severance and benefits available upon a without-cause termination.

20. Plaintiff was qualified for the position of Superintendent and performed her duties in a manner consistent with the responsibilities of that office.

21. As Superintendent, Plaintiff was subject to the authority of SCBOE, including the Board's authority over continued employment, discipline, termination, contractual benefits, public employment proceedings, and related employment decisions.

22. The hostility toward Plaintiff and efforts to undermine her continued employment developed before the formal termination proceeding. Plaintiff alleges that, during her tenure, certain Board members engaged in conduct that interfered with her day-to-day authority, undermined her leadership, and created workplace conditions inconsistent with the standards, policies, and procedures governing her role.

23. On March 6, 2024, while Plaintiff was performing District consulting and transition work in preparation for assuming the Superintendent position on April 1, 2024, Board Member Mauricio Calvo posted every page of Plaintiff's consulting agreement to Instagram and disseminated it to news media. Page five displayed Plaintiff's home address. Plaintiff sent the link to Board Member Kevin Woods and reported the disclosure to then-Chair Greene. Greene sent Calvo a written response, but the address already had been publicly disclosed.

Plaintiff alleges this disclosure contributed to the safety-related and hostile conditions she later reported.

24. On or about June 25, 2024, Chief Greg Sanders informed Plaintiff that Board Member Mauricio Calvo had directed him to discontinue Plaintiff's security. On June 29, 2024, Plaintiff emailed then-Board Chair Althea Greene and MSCS General Counsel Justin Bailey concerning Calvo's reported effort to discontinue her contractual security, his direction to members of her staff, his prior public disclosure of documents containing her home address, and her resulting safety concerns. Greene responded that she would request a meeting with Calvo that included Plaintiff and Bailey, but the meeting did not occur. In a subsequent conversation with Greene, Plaintiff stated that Board members had not interfered with the security provided to male Superintendent Dr. Joris Ray and that she believed Calvo's treatment of her was gender-based. Although Calvo's direction did not permanently eliminate all security, obtaining security thereafter became inconsistent and difficult, leaving Plaintiff without security at multiple District activities and events. On August 8, 2024, while Plaintiff lacked security, Peer Power representative Dow McVean accosted her concerning a contract in the presence of Board Member Kevin Woods, who attempted to calm McVean. Plaintiff made a police report that day and sought a protective order the following day.

25. On August 12, 2024, before Murphy was sworn into office as a Board Member, Murphy sent a written communication to a community member stating, "I gotta get rid of her." Murphy later acknowledged the communication but testified that she did not recall whom she meant by "her." Murphy later became one of the Board members publicly advocating Plaintiff's removal and voted to terminate her employment.

26. On August 27, 2024, SCBOE changed the reporting structure of the Office of

General Counsel so that General Counsel reported solely to the Board and placed Contracts Management within that office. Plaintiff objected that General Counsel reviewed District contracts and that excluding the Superintendent from oversight while continuing to hold her accountable for those matters conflicted with the Superintendent's responsibilities. SCBOE nevertheless approved the restructuring. Plaintiff alleges that the Board later relied upon criticisms concerning contracts, MOUs, and related District-partner matters after it had altered the reporting structure governing those functions.

27. On September 26, 2024, former Board Chair Althea Greene sent the newly constituted Board a letter, provided by Deidre Malone, attacking Plaintiff's qualifications and leadership and disseminated the letter through the news media. Greene characterized Plaintiff as "the least qualified candidate" for Superintendent, asserted that Plaintiff had sought to transition into the position "without any assistance from the board or the immediate past interim superintendent," and stated that the Board should have required Plaintiff to work with former Interim Superintendent Tutonial Williams.

28. Contemporaneous March and May 2024 communications in which Greene participated contradicted that account. Before assuming office, Plaintiff sought Williams's assistance, scheduled a March 25 transition meeting, and supplied ten substantive areas for discussion. Williams deferred the meeting stating that she was awaiting Board decisions concerning "transition details and agreements." The Board thereafter structured Williams's consulting work through Greene as its designee rather than directly through or including Plaintiff. Plaintiff alleges that Greene's dissemination of the contradicted account after Plaintiff's gender-based complaint to Greene contributed to the campaign questioning Plaintiff's qualifications and leadership.

29. During August, September, and October 2024, Plaintiff repeatedly communicated with Coleman concerning Board Member Towanna Murphy's conduct and broader Board-member interference with Plaintiff's exercise of her executive and administrative responsibilities. On or about August 26, 2024, Plaintiff reported to Board Chair Coleman concerning Murphy's public social-media conduct and Coleman informed Plaintiff that she spoke with Murphy and warned her regarding her actions.

30. On or about September 7, 2024, after Plaintiff brought additional conduct by Murphy to Chair Coleman's attention, Coleman informed Plaintiff that she had engaged in a lengthy conversation with Murphy, had told Murphy that "she has to stop," and that she "has been warned." Plaintiff responded: "It's concerning. I'm not confident that it will stop." Coleman stated that she would continue watching Murphy's conduct.

31. On September 9, 2024, Plaintiff provided Board Chair Coleman Board Policy 0018 concerning Board communications with District staff in connection with Plaintiff's concern that Board members were overstepping governance boundaries. Coleman responded that she would speak with Board members and subsequently provided Policy 0018 to all Board members.

32. After assuming office, Murphy repeatedly involved herself in matters within Plaintiff's executive and administrative authority. Among other things, on September 12, 2024, Murphy pressured Plaintiff concerning MSCS's relationship with Peer Power and told Plaintiff that she needed to fix that relationship and doing so would earn Plaintiff "brownie points." Murphy subsequently testified that she did not know the District's financial obligation concerning Peer Power and had not investigated those financial matters before pressing Plaintiff concerning the vendor relationship.

33. Contemporaneous MSCS records reflected substantive financial and performance concerns regarding Peer Power, including approximately $2.4 million associated with high-school student tutoring for which student participation and performance data did not support continued investment, and approximately $1.3 million associated with college-student success coaches and ACT support for which the District concluded that results had not improved to a level supporting the investment. Plaintiff alleges that Murphy's pressure concerning Peer Power occurred notwithstanding those documented District concerns and formed part of the Board-level interference about which Plaintiff reported to Board leadership.

34. Plaintiff alleges that Board-level conduct continued to escalate through public statements, media communications, social media commentary, operational interference, and communications outside ordinary performance, evaluation, or disciplinary channels.

35. After Plaintiff's complaints, the interference and public undermining intensified. Murphy criticized Plaintiff publicly and through social media rather than presenting concerns to Plaintiff through the channels required by Plaintiff's agreement and Board policy. In October 2024, Murphy prepared or circulated a purported resolution stating that Plaintiff was immediately suspended. Board Member Natalie McKinney sent communications to the full Board asserting that Plaintiff should not meet elected officials without Board approval, demanding information about Plaintiff's conversations and meetings, directing that all future communications with elected officials go through General Counsel, and questioning Plaintiff's capability to perform the role. Board members also excluded Plaintiff from evaluation-related meetings and interfered with functions assigned to the Superintendent, including District operations, contracts, events, and vendor matters.

36. These were recurring acts during Plaintiff's employment, not only statements

made at the termination meeting. They impaired Plaintiff's ability to direct staff and operations, forced her to divert time to public attacks and Board-member demands, weakened her authority with employees and community partners, and caused Plaintiff to perceive her work environment as hostile and abusive. Plaintiff alleges that the conduct was gender-based because she was the District's first woman Superintendent; she repeatedly identified the sex-based disparity to Board leadership and counsel; staff told her that male Superintendent Ray had been allowed substantially greater independence; Bailey reported that Board members themselves understood that Plaintiff might report a hostile environment based on gender bias; and the campaign later included sexualized allegations used to attack Plaintiff's fitness and credibility as a woman executive.

37. Through these communications, Plaintiff expressly complained to Greene, Coleman, Love, and Bailey that Board members were subjecting her to gender-based disparate treatment, unequal scrutiny as a female executive, and hostile working conditions based on sex. SCBOE leadership and counsel therefore knew of Plaintiff's opposition to perceived sex discrimination before the formal termination proceeding began.

38. On September 27, 2024, Murphy publicly joined criticism of Plaintiff during the same media coverage reporting negative letters, written and published by Deidre Malone, on behalf of former Board Chair Althea Greene and former Board Member Mauricio Calvo concerning Plaintiff's leadership. During that coverage, after Greene and Calvo's criticisms of Plaintiff were detailed, Murphy stated: "The key point to this is, it's about the children, it is about the teachers," and further stated, "if it's not about the teachers and the rest of the employees then there is no need to have her." Plaintiff alleges that the timing and context of Murphy's public statement—made as Greene's and Calvo's criticisms were being publicly

disseminated to influence the newly constituted Board's evaluation of Plaintiff—are relevant to the developing course of conduct seeking to undermine Plaintiff's leadership and continued employment.

39. Between September and November 2024, Plaintiff complained separately to Board Chair Joyce Dorse Coleman and Vice-Chair Stephanie Love by telephone and during individual meetings that certain Board members were creating a hostile and volatile environment, subjecting her to unequal scrutiny, interfering with her authority, and treating MSCS's first female permanent Superintendent differently from her male predecessor. Plaintiff told Coleman and Love that District staff had reported that the Board had not treated Dr. Joris Ray in the same manner and that Ray had been permitted substantially greater independence. Coleman acknowledged that Plaintiff was operating in a hostile or volatile environment and acknowledged problems involving Murphy, McKinney, and other Board members.

40. During Plaintiff's first individual meeting with Love in approximately February 2024, Love stated that she sometimes crossed the boundary between the role of a Board member and the role of the Superintendent and instructed Plaintiff to address the conduct when it occurred. During Plaintiff's tenure, Plaintiff did so. Love did not respond positively when Plaintiff attempted to enforce those boundaries and, on other occasions, apologized for communications or conduct that Plaintiff had identified as aggressive or unprofessional, including emails written in capitalized or emphasized text. Plaintiff alleges that Love's acknowledgments and apologies demonstrate that Love knew her conduct was interfering with Plaintiff's authority and working conditions. Neither Coleman nor Love took effective action that corrected the conduct Plaintiff reported.

41. During interactions concerning Plaintiff's leadership, Love repeatedly compared

Plaintiff with her male predecessor by invoking what "Joris would have" done, what "Joris would not have" done, or how matters had been handled "when Dr. Ray was Superintendent." Plaintiff complained that these repeated comparisons, together with the interference and scrutiny imposed upon her but not upon Ray, reflected a different standard for her as MSCS's first female permanent Superintendent.

42. By October 2024, efforts concerning Plaintiff's removal had progressed beyond criticism of Plaintiff's performance. On October 14, 2024, while Plaintiff's midyear evaluation was also under consideration, Chair Coleman and Vice-Chair Love introduced a resolution to "Recommit Relationship With SchoolSeed." Board Member McKissack questioned the resolution because the Board had not taken comparable action concerning SchoolSeed in prior years. The resolution preceded the November 16 discussion among Love, Murphy, and Otey about placing Plaintiff in an uncomfortable position and the subsequent public confrontations concerning SchoolSeed during the November 19 and December 3 Board meetings.

43. On October 17, 2024, a proposed suspension document was publicly disseminated. The document called for Plaintiff's immediate suspension from the position of Superintendent and included allegations concerning, among other matters, the approximately $45,635.33 SchoolSeed check. Murphy subsequently admitted under oath that she had drafted a proposed suspension of Plaintiff containing allegations intended to support Plaintiff's suspension. Murphy testified that she privately discussed with Chair Coleman that the Board should take a more "measured approach". Murphy later referred to the document as "my suspension" under oath: "It was a copy of the suspension I wrote up." Murphy confirmed that she authored the document.

44. Four days later, on October 21, 2024, Plaintiff received a communication from a

community member warning her to "watch your back…Board member Murphy, Whitelaw, and [Board Attorney] are out to get you" and reporting that Murphy intended to recommend Plaintiff's termination at the upcoming Board meeting. The community member added further that Whitelaw would be placed in an interim role, that principals were expected to speak against Plaintiff, and that "Murphy says she has the 5 votes" to terminate Plaintiff's contract. The sender stated, "Here is some of what they are going to use (see attached)." One of the materials attached to that communication was the same proposed suspension document publicly disseminated on October 17.

45. Plaintiff promptly forwarded the October 21 communication and attached material to General Counsel Justin Bailey and Chair Coleman and spoke with Coleman concerning the report. Coleman told Plaintiff that nobody was terminating anybody and stated that she would address the matter with Towanna Murphy. Bailey did not respond.

46. Coleman subsequently testified that she had decided by October 2024 that Plaintiff should be terminated and that, before presenting the December 17 termination resolution, she did not pursue corrective action, coaching, mediation, performance-improvement measures, legal review, suspension, reassignment, or any alternative to termination. Coleman further testified that she contacted Deidre Malone of the Carter Malone Group ("CMG") in early December for a communications strategy concerning Plaintiff's termination; asked Malone for termination talking points and review of the proposed resolution; met with Malone while Vice-Chair Stephanie Love separately met with Malone at the same location; and discussed Plaintiff's possible termination, whether sufficient votes existed, and communications strategies for the possible outcomes.

47. In both pre-recorded videos recorded through CMG to disseminate publicly,

however, Chair Coleman announced only one outcome: Plaintiff's termination and the immediate selection of her male replacement, notwithstanding that the Board had not yet voted on either matter. In the recorded videos recorded prior to the December 17 meeting, Coleman stated, "Tonight, your school board made a difficult but necessary decision to end the employment contract with Superintendent Dr. Marie Feagins," and then stated, "The board also voted to appoint Dr. Roderick Richmond as the interim superintendent." Coleman further referred to "today's decision."

48. On or about November 5, 2024, Plaintiff spoke with MSCS General Counsel Justin Bailey about her previous reports to him regarding Murphy's public criticism, information that Murphy and others claimed to have five votes to remove Plaintiff, the October 2024 circulation of a purported resolution immediately suspending Plaintiff, Plaintiff's exclusion from meetings concerning her evaluation, Board-member interference with District operations, and the Board's reassignment of General Counsel and Contracts Management outside Plaintiff's supervision.

49. Plaintiff further told Bailey that District staff had said the Board had not treated Dr. Ray that way and was treating Plaintiff differently because she was a woman. Bailey responded that Board Chair Coleman and other board members had expressed concern after the November 5, 2024 executive session that Plaintiff "might report a hostile work environment" based on gender bias and discriminatory conduct. The following day, November 6, Bailey executed SCBOE's agreement retaining CMG to work with the General Counsel and Board Chair on public relations, media relations, crisis communications, social media, and community relations.

50. On November 16, 2024, while Plaintiff was serving as a panelist at a Memphis

Shelby Crime Commission event, community member Karen McGhee overheard Board Members Stephanie Love, Towanna Murphy, and Sable Otey in a restroom discussing a plan to place Plaintiff in an uncomfortable position and arrange for someone to ask a question Plaintiff supposedly could not answer at an upcoming meeting. McGhee heard the members state, "Let's catch her in a very uncomfortable position" and "Let's get someone to ask a question that she won't be able to answer."

51. Three days later, during the November 19 Board meeting, Love initiated a public confrontation concerning SchoolSeed and federal grant funds. Love characterized SchoolSeed as a fiscal arm of the District, questioned Plaintiff publicly about funds controlled by SchoolSeed, and distributed an Intent to Award Letter concerning a proposed federally funded SchoolSeed contract. SchoolSeed was a separate private organization that did not report to Plaintiff, and Plaintiff had not been provided access to its bank accounts, general ledger, bank statements, or other records identifying the MSCS-related funds it controlled. Intent-to-award and contract-processing documents were handled through the responsible District departments and were not ordinarily submitted to the Superintendent. Plaintiff therefore had not received the Intent to Award Letter before Love unexpectedly presented it during the meeting.

52. Board Members Love, Murphy, and Otey continued pressing the SchoolSeed donation and federal-grant issues during the November 19 and December 3 Board meetings. On December 3, SchoolSeed Executive Director Vince McCaskill publicly accused Plaintiff of making false statements concerning SchoolSeed and the federal funds. SchoolSeed was the proposed recipient of the contemplated $250,000 contract. The proposed contract was submitted into the District's Board-item process by Karen Ball-Johnson on October 3, 2024, after the September 30 federal obligation deadline, when no SchoolSeed contract had been

executed. No representative of the Tennessee Department of Education had stated that MSCS lost the underlying grant funds merely because SchoolSeed did not receive that contract. The District ultimately used the funds for allowable grant expenses by the January 28, 2025 liquidation deadline.

53. Otey also transmitted the SchoolSeed allegations to SCBOE's retained communications consultant, Deidre Malone. On December 4, 2024, Otey texted Malone images concerning the returned $45,635.33 donation and wrote, "Why did we get this? Until we understand what is going on . . . we are not depositing anything." On December 9, Otey told Malone, "Vincent just sent this," and relayed McCaskill's assertion that, because the proposed SchoolSeed contract had not been finalized by September 30, the federal funds had to be returned to the State, "304k exactly." Otey transmitted these materials while Malone was developing the Board communications plan that concerned Plaintiff and her contemplated termination. Plaintiff alleges that the communications show information originating with McCaskill and SchoolSeed moving through Otey to Malone during the development of the termination rationale and public message.

54. The separate $45,635.33 SchoolSeed matter concerned remaining funds routed to SchoolSeed from donors specifically to fund a District leadership meeting, not an unsolicited personal donation requested or accepted by Plaintiff. On June 15, 2024, before these events, Plaintiff had directed then-CFO Tito Langston and Deputy Superintendent Angela Whitelaw to ensure that funds intended for District activities were routed through the District's newly established partnerships office explaining, "We have pockets of money seated everywhere, and we still seem to come up short when attempting to execute a plan." The November 19 Board item seeking approval to accept the remaining SchoolSeed funds identified Dr. Angela

Whitelaw as the responsible party. Plaintiff did not request, personally receive, deposit, spend, conceal, or direct anyone to conceal the check.

55. The public confrontations contemplated during the November 16 conversation occurred after Plaintiff's protected complaints and concerned matters that had not been presented to her through the ordinary operational and contracting process. The sequence continued from the November 19 confrontation to McCaskill's December 3 presentation, to Otey's December 4 and December 9 transmission of the SchoolSeed materials to Malone, and ultimately to the December 17 termination resolution. That resolution used both SchoolSeed matters—the $45,635.33 and the proposed federally funded contract—as grounds for accusing Plaintiff of dishonesty. Plaintiff alleges that Love, Murphy, and Otey used incomplete or inaccurate descriptions of departmental matters to surprise and discredit her publicly and then channeled those matters into the communications process supporting her proposed for-cause termination.

56. By December 2024, the conduct about which Plaintiff had reported had accelerated from interference with her authority and public attacks on her leadership to an organized effort to terminate her employment for cause and deny the severance and benefits available under her contract. Plaintiff alleges that, after the Board Chair and General Counsel knew of her complaint, SCBOE used the CMG engagement to coordinate the termination rationale, public messaging, and Richmond succession plan.

57. On December 7, 2024, ten days before the first public meeting on Plaintiff's proposed termination, CMG principal Deidre Malone spent approximately four hours working on a Board communications plan based on communications from the school board. Malone later testified that the communications plan, entitled "DMF" on her invoices, referred to "Dr.

Marie Feagins" and approximately eighty percent addressed the potential termination of Plaintiff's contract. Coleman later testified that she supplied Malone with the proposed termination resolution approximately two weeks before the December 17 public meeting and did not dispute that approximately eighty percent of the CMG communications plan concerned Plaintiff's termination. CMG therefore possessed and was developing communications concerning the proposed termination well before Plaintiff received notice of the resolution or an opportunity to respond.

58. By December 9, 2024, CMG's written communications plan stated that SCBOE had "decided to terminate" Plaintiff and identified Roderick Richmond as the interim Superintendent. The plan scheduled discussion with Coleman, Vice-Chair Stephanie Love, and Bailey beginning December 8; preparation of releases, social-media material, emails, and an op-ed; media training for Coleman and Love; and recording Coleman on December 16. CMG's billing records show that its personnel edited Coleman and Love's special-meeting scripts, drafted the employee video script concerning Plaintiff's termination, filmed and edited two Coleman videos on December 16 and 17, and prepared key messages and a press release concerning Plaintiff's termination.

59. On December 10, Coleman and Vice Chair Stephanie Love participated together in CMG media training concerning the proposed termination. Malone testified that Coleman and Love reviewed for approval a termination news release, key messages, and potential questions and answers concerning cancellation of Plaintiff's contract. CMG also prepared special-called meeting scripts for Coleman and Love and communicated with both members concerning that work.

60. On December 13, 2024, Richmond emailed Bailey written "Top 5 Highlights"

supporting Richmond's candidacy for Superintendent and biographical materials. Bailey forwarded Richmond's materials from his personal email account to Malone that day. CMG thereafter incorporated Richmond's qualifications and planned succession into termination and transition materials. On December 17 at 1:28 p.m., Malone emailed Otey, McKinney, Murphy, and Love a document entitled "Key Messages for Memphis-Shelby County Schools Board Members." The document stated, hours before the December 17 public meeting began, that SCBOE "voted to terminate" Plaintiff and that Richmond "has been appointed" interim Superintendent.

61. CMG's records also show member-specific work and coordination. Malone billed for individual communications with Coleman, Love, Murphy, Otey, and McKinney; prepared or revised statements, scripts, talking points, pages of "research" materials characterizing Plaintiff's decisions as grounds supporting termination, and key messages for Board members; and worked with Bailey and Robert Spence on termination-related communications. The January media strategy called for positioning members who favored termination with selected media, distributing McKinney's statement, aligning allegations for a press account, revising key messages after Plaintiff's January 14 response, and publishing post-vote opinion pieces.

62. Plaintiff alleges that these records support a reasonable inference that Board leadership and members of the eventual voting majority developed the termination rationale, public message, and Richmond transition before completing the process offered to Plaintiff. Plaintiff relies on CMG's work as evidence of SCBOE's decision making, knowledge, motive, causation, and pretext. Plaintiff does not allege that CMG's status as a consultant, standing alone, makes CMG or Malone liable under Title VII.

63. At the beginning of the December 17, 2024, meeting, Plaintiff had received no

advance notice of the asserted grounds, had not been provided the supporting evidence, and had not been given a printed or electronic copy of the proposed termination resolution. Plaintiff listened as Coleman read the resolution during the meeting. During the meeting, Plaintiff requested on the record a hearing and a meaningful opportunity to respond to the allegations being used to support the proposed termination of her employment. General Counsel Justin Bailey stated that Plaintiff was not entitled to a hearing under her contract or applicable law. McKissack testified that, when the resolution was presented on December 17, she received only the resolution. No supporting documents or corroborating witnesses were presented, she was unaware of any prior investigation concerning the asserted misconduct, and she did not recall the members supporting termination presenting evidence substantiating the resolution.

64. During the December 17, 2024, meeting, Plaintiff further alleges that stigmatizing public statements were made about Plaintiff's leadership, including accusations by Board Member Sable Otey attributing an alleged employee's suicidal thoughts to Plaintiff's leadership, and that these statements contributed to escalating hostile conditions and retaliatory conduct by Board members.

65. Before the Board proceeded to vote on the termination resolution, Plaintiff interjected and asked whether she could submit a written response. The Board voted to permit Plaintiff to submit a response by January 14, 2025. The written-response process did not include disclosure of the supporting evidence, questioning of witnesses, discussion with Board members, or a further opportunity to respond to the additional accusations later presented by McKinney and the evidence and conclusions later presented by Spence.

66. On December 18, 2024, one day after the termination resolution was first presented, while that resolution remained pending and before Plaintiff presented her detailed

response, Murphy publicly stated during a televised FOX13 interview: "My stance is she, I want her gone. Okay. That's my stance, and that's it." Murphy further stated, "At this point, it's no hope." Murphy later authenticated the interview during her deposition and confirmed under oath that wanting Plaintiff gone was her stance.

67. After the December 17 vote was deferred, CMG's termination-related work continued with members who ultimately supported Plaintiff's termination. On December 20, Malone held individual calls with Otey, Murphy, and Love concerning Plaintiff and communications strategy. On December 22, Malone held an approximately ninety-minute call with McKinney and testified that Plaintiff's termination was discussed. CMG continued preparing messaging and strategy concerning what would occur next.

68. On December 24, 2024, Plaintiff's counsel requested that Board counsel identify the specific contractual provisions, policies, statements, factual matters, evidence, and supporting materials underlying the proposed for-cause termination resolution.

69. On December 26, 2024, before Plaintiff submitted her written response, Coleman publicly stated that her position had not changed. Coleman later testified that the statement meant she was still voting for termination.

70. On December 31, 2024, Robert Spence acknowledged that he had been retained to represent SCBOE concerning the pending termination resolution but refused to provide the requested materials. In his letter, Spence stated that the Board would not provide discovery, that the matters were purportedly already known to Plaintiff, and that "no further explanation or clarification is needed regarding the matters set forth in the Resolution and none will be provided." He characterized the accusations as matters of "professional misconduct," asserted that the December 17 resolution constituted notice provided to Plaintiff "as a courtesy,"

asserted that Plaintiff's written response was due January 6, 2025, notwithstanding the Board's authorization permitting Plaintiff to respond by January 14, and denied counsel's request to address the Board on Plaintiff's behalf at the January 14 meeting.

71. On January 5, 2025, while the same termination resolution remained pending, Murphy communicated to Board members concerning the theft of her vehicle: "These folks came to my house and stole my car. Now the police are here. TBI is being alerted. Dr. Feagins and her crew playing a dangerous game." Murphy also called Memphis Mayor Paul Young and alleged that Plaintiff was responsible for the theft of Murphy's vehicle. Murphy subsequently testified that she did not know who stole her vehicle and explained "these folks" as Plaintiff's supporters. The police report concerning the theft does not identify Plaintiff as having stolen Murphy's vehicle or as having participated in or directed its theft. Plaintiff alleges that Murphy nevertheless associated Plaintiff by name with serious criminal conduct in communications to Board members, the public, and the Mayor of Memphis while the Board was considering whether to terminate Plaintiff for alleged dishonesty and misconduct.

72. In response to the attempted advancement of the deadline, Plaintiff submitted a preliminary two-page response on January 6, 2025. Plaintiff then submitted and publicly presented her complete twelve-page response on January 14, the date originally authorized by the Board. Plaintiff therefore did not refuse or fail to respond to the allegations.

73. On January 9, 2025, Coleman and Love again met together with Malone, General Counsel Bailey, and Jennifer Sharp concerning Board communications. The session addressed the communications strategy carried forward from December, including key messages and questions and answers concerning Plaintiff's termination. During the media training, CMG went "back and forth" with Coleman and Love concerning questions and responses, including the

reasons for terminating Plaintiff's contract and the Board's anticipated next steps.

74. By January 10, CMG's termination communications work included information identifying Coleman, Love, McKinney, Murphy, and Otey as favoring termination; Williams and Porter as potentially undecided; and McKissack and Huett-Garcia as favoring retention. Plaintiff alleges that this information, together with CMG's continuing member-specific communications and termination messaging, further supports her allegation that the asserted process for receiving and considering her response did not precede the development of the termination position and public rationale.

75. Murphy further testified that she received Plaintiff's written response "on the floor" on January 14 and had not reviewed it before the January 21 termination vote. She nevertheless voted to terminate Plaintiff on January 21 pursuant to the original December 17 resolution. Plaintiff alleges that Murphy repeatedly announced her desired outcome at least five months before Plaintiff presented her January 14, 2025 response to the asserted grounds for termination.

76. On January 14, 2025, Plaintiff received information that Councilman J.B. Smiley had told FOX13 reporter Kayla Solomon that former employee Camalyn Turner was at the District Attorney's office pursuing an accusation of a sexual nature against Plaintiff; that McKinney – in collaboration with Chair Coleman – would invoke the accusation during the January 14 proceedings to support an immediate for-cause termination vote; and that Malone reportedly provided the embargoed statement detailing the allegation to local media to reveal in concert with the board meeting. Plaintiff disclosed and denied that reported plan when she opened her January 14 response. McKinney later read a prepared statement containing additional allegations during the regular business meeting following the committee meeting.

77. Plaintiff alleges that the Board's threatened use, handling, and dissemination of fabricated sexualized allegations against its first female permanent Superintendent differed materially from its handling of professional misconduct allegations concerning male Superintendent Ray. McKissack, who served as Board Chair during Ray's tenure, testified that SCBOE placed Ray on administrative leave, publicly voted to hire outside counsel to perform a months-long investigation, and ultimately approved a negotiated separation. In Plaintiff's case, board members in the removal effort identified one set of accusations in the December 2024 termination resolution; returned in January 2025 with additional unvetted allegations; and threatened to use an accusation of a sexual nature before Plaintiff had received the allegation or supporting evidence. The accusation was later investigated and closed as unsubstantiated.

78. The grounds publicly advanced against Plaintiff continued to expand after she responded to the December 17 termination resolution. Plaintiff read her prepared response during the January 14, 2025 committee meeting. Chair Coleman then stated that there would be no discussion and adjourned that meeting. Although the January 14 agenda contemplated questions and answers, no Board member asked Plaintiff a question concerning her response.

79. CMG's termination materials used conclusive language concerning dishonesty and contractual violations before Plaintiff presented her January response. Additional accusations and examples continued to be collected and incorporated thereafter. Plaintiff alleges that the sequence—development of a for-cause termination message first, followed by the continued collection and expansion of supporting accusations—is evidence that SCBOE's stated reasons were not the actual reasons for the decision.

80. During the January 14, 2025, regular business meeting, Board Member Natalie McKinney publicly advanced additional accusations concerning Plaintiff, including alleged

student-achievement and graduation failures, dismantling of student-support systems, staffing deficiencies, contract and curriculum failures, operational problems associated with overtime restrictions, lack of formative-assessment resources, and a purported "climate of fear and intimidation" among District employees. McKinney stated that the matters were supported by "documentation that I've provided to the attorney." McKinney simultaneously published the same accusations in an op-ed that CMG, through Deidre Malone, had prepared before the termination vote.

81. Media reporting from the January 14 meeting described McKinney as "introducing new allegations" against Plaintiff. Board Member Michelle McKissack objected that the accusations were "outside the resolution" and that "the goal post keeps changing here." Board Member Amber Huett-Garcia stated that McKinney had crossed "the line of governance" and described the presentation as "so disrespectful." Plaintiff had received no notice that McKinney would present these additional matters or supporting documentation and had no meaningful opportunity to investigate and respond before the January 21 vote.

82. Coleman testified that, after reading Plaintiff's detailed January 14 response, she conducted no follow-up research, did not contact Plaintiff to discuss the response, and did not change her view concerning any allegation. She testified that she was unaware of any new evidence arising between December 17 and January 21, that the allegations did not materially change, and that the January 21 termination resolution was the same resolution originally presented on December 17. Coleman further testified that, for her, the choice remained "termination or nothing."

83. After Plaintiff had submitted her responses, SCBOE's Special Counsel Robert Spence commenced a review between January 15 and January 20, 2025. In the report dated

January 21, 2025, Mr. Spence acknowledged that the review was conducted during an "unusually compressed timeframe," involved no subpoenas or interviews, and relied upon materials provided by MSCS together with Plaintiff's written responses.

84. On January 21, 2025, the day of the termination vote, Mr. Spence publicly presented the resulting report to the Board, stating that his firm had been asked to "ascertain the facts" and describing the contents of the report as "these are the facts." The report stated varying conclusions accusing Plaintiff of dishonesty and multiple violations of her employment contract and Board policies. Plaintiff was not provided with the report and was not afforded any opportunity to review, investigate, and respond to its evidence, reasoning, and contents before SCBOE voted to terminate her employment.

85. Mr. Spence's January 21 report also materially qualified one of the grounds asserted for Plaintiff's termination. The December 17 resolution accused Plaintiff of misleading the Board and public concerning the availability of federal grant funds. In his report, however, Mr. Spence acknowledged that the State ultimately permitted MSCS to use grant funds as reimbursement for allowable activities and expenses, including salaries, and characterized Plaintiff's statement concerning the continued availability of funds as "accurate to a degree, but not completely." The report nevertheless relied upon that subject matter in finding that Plaintiff had made false or misleading statements and violated contractual and ethical obligations.

86. Mr. Spence's December 31 letter did not identify or explain the evidence supporting the accusations. Instead, it confirmed that SCBOE would provide no supporting materials, explanation, or clarification before Plaintiff submitted her response. After Plaintiff submitted and publicly read that response, SCBOE relied upon additional accusations presented by McKinney on January 14 and upon Spence's January 15–20 review, January 21

presentation, and undisclosed report. Plaintiff was not provided the report to review, investigate, and respond to its contents before SCBOE voted to terminate her employment minutes later. Board Member McKissack likewise testified that she received the 209-page report approximately thirty minutes before the public meeting and could not read it before the Board acted.

87. McKissack independently disputed the factual grounds asserted in the termination resolution. She did not agree that Plaintiff had misled the Board concerning overtime, did not agree that Plaintiff had improperly accepted the SchoolSeed donation, and testified that Plaintiff's statement concerning the continued availability and reallocation of the federal grant funds was accurate. McKissack further disagreed that Plaintiff had failed to communicate or cooperate, testified that Plaintiff communicated with the Board, community, parents, and students, and testified that she had never observed Plaintiff engage in dishonesty, lack of candor, or professional misconduct.

88. On January 21, 2025, SCBOE voted to terminate Plaintiff's employment contract pursuant to the same termination resolution first presented on December 17, 2024, denied Plaintiff severance and other employment-related benefits, and did so without providing Plaintiff a meaningful opportunity to respond through a fair process before the decision became final.

89. Immediately after the January 21 termination vote, Coleman recommended Richmond to serve as Interim Superintendent; SCBOE thereafter appointed him to that position and ultimately selected him as Superintendent. Richmond is male. Plaintiff alleges that SCBOE's advance termination announcements, its pre-proceeding succession work concerning Richmond, and its replacement of Plaintiff with a man support a reasonable inference that sex

was a motivating factor and that the stated reasons for Plaintiff's termination were pretextual.

90. Three days after the termination vote, on January 24, 2025, Murphy publicly explained her vote to terminate Plaintiff by citing Plaintiff's elimination of approximately 1,100 District positions. That asserted reason was not identified as a ground for termination in the December 17 termination resolution on which SCBOE ultimately voted.

91. On January 26, 2025, Deidre Malone, principal of CMG and SCBOE's retained PR firm, publicly stated that Plaintiff had been terminated because she was not signing contracts during her appearance on ABC24. Plaintiff's alleged failure to sign contracts likewise was not identified as a stated ground for termination in the December 17 termination resolution.

92. Neither Murphy's nor Malone's explanations appeared among the stated grounds in the December 17 resolution pursuant to which the Board terminated Plaintiff. Plaintiff alleges that these materially different explanations offered immediately after the vote further support an inference that the reasons stated in the resolution were not the actual reasons for SCBOE's decision.

93. After Plaintiff's termination, Deidre Malone drafted and coordinated an op-ed for MSCS Principal John Bush titled "Leadership in Crisis: A Call for Accountability and Change." CMG's January 25, 2025 invoice records Malone's communication with Bush concerning a potential op-ed, and CMG produced the draft bearing Bush's name in court-ordered discovery. The op-ed was thereafter published under Bush's name and accused Plaintiff of recklessness, untrustworthiness, failing to listen to District stakeholders, disregarding District concerns, and allowing contracts to expire.

94. On March 19, 2025, Plaintiff's counsel notified Bush that Plaintiff disputed the publication's accusations as false and professionally damaging and demanded that he cease

making the statements, remove the publication from public platforms, and confirm compliance. On March 21, 2025, MSCS General Counsel Justin Bailey responded on SCBOE letterhead, defended the publication, and offered no correction or retraction. Plaintiff alleges that Malone prepared and coordinated the op-ed within CMG's Board-funded communications engagement and that SCBOE adopted or ratified the publication when its General Counsel formally defended it after receiving notice of Plaintiff's objections. The publication further impaired Plaintiff's professional reputation and prospects for substantially equivalent employment.

95. Board Member Michelle McKissack, who personally observed the Board's treatment of Plaintiff, testified that the criticism directed toward Plaintiff was "very harsh"; identified McKinney, Coleman, Love, and Murphy as the primary members directing that criticism; stated that those members did not like Plaintiff and were "very terse" toward her in public meetings; and testified that she did not agree with their criticisms. McKissack further testified that she had never seen a Superintendent's termination handled in the manner Plaintiff's termination was handled and was concerned by the speed of the process because the asserted concerns had not previously been shared publicly.

96. When asked whether the Board members' conduct created a hostile work environment for Plaintiff, McKissack stated "yes" and identified the "comments made," "the tone of interactions publicly," and the fact that "there were certain members of the Board that did not like her" as the basis for her answer.

97. Former Superintendent Dr. Joris Ray held the same Superintendent position, reported to SCBOE, and was subject to Board authority over investigation, continued employment, separation, compensation, and public communications. After allegations involving relationships with District employees and abuse of authority became public and an

investigation began, SCBOE permitted Ray to resign and approved negotiated separation compensation and benefits. Five of the nine members serving when Plaintiff was terminated—Michelle McKissack, Joyce Dorse Coleman, Amber Huett-Garcia, Keith Williams, and Stephanie Love—also served during Ray's tenure. The Board afforded Ray a negotiated exit rather than a public for-cause termination.

98. Plaintiff does not rely exclusively on comparator evidence. She also relies upon her replacement by a man, SCBOE's pre-vote planning for that replacement, her contemporaneous sex-discrimination complaints, SCBOE's knowledge of those complaints, the escalation after her complaints, the predetermined termination communications, and the materially different treatment of male Superintendent Dr. Joris Ray.

99. After Plaintiff's termination, SCBOE engaged in additional conduct that Plaintiff alleges was retaliatory, including its handling and use of the Turner allegations and its involvement in the Bush publication described above. After SCBOE initiated an investigation concerning allegations made by Camalyn Turner, Plaintiff repeatedly requested the complete allegations and supporting evidence so that she could respond fully and correct the investigative record. On April 21, 2025, Plaintiff submitted through counsel a written response for inclusion in the investigative record. Plaintiff explained that she had not been provided the allegations, categorically denied any assertions alleged by Turner, and supplied a factual response based upon the limited information then available to her.

100. On or about July 16, 2025, during Plaintiff's deposition in related proceedings, Plaintiff was questioned about the same closed or undisclosed investigation even though SCBOE had not disclosed the investigation's outcome or contents to Plaintiff.

101. On or about July 22, 2025, immediately before Plaintiff's injunction hearing,

Jarrett Spence, while acting as counsel for SCBOE, personally provided Plaintiff's complete deposition transcript to Daily Memphian reporter Laura Testino in the courtroom. The transcript included Plaintiff's testimony concerning the Turner allegations.

102. On July 28, 2025, the Daily Memphian published an online report discussing the Turner allegations and Plaintiff's deposition testimony. The publication stated that comments were disabled "to protect the victim." At that time, SCBOE had not disclosed to Plaintiff that its retained investigator had closed the allegations as unsubstantiated. Plaintiff alleges that the presentation portrayed her as a perpetrator despite the unsubstantiated disposition and caused additional professional and reputational harm.

103. On November 7, 2025, investigator Rodrick Holmes informed Plaintiff's then-counsel that the investigation had been closed as unsubstantiated in approximately May 2025 and stated that he would provide a closure letter. Plaintiff requested the written disposition so that the investigative record would accurately reflect the outcome and so that she could address the continuing professional harm caused by the public allegations. Plaintiff did not receive the promised letter. Plaintiff's successor counsel renewed the request on December 18 and December 22, 2025, but neither Holmes nor SCBOE provided the closure letter or written disposition.

104. On May 7, 2026, Plaintiff submitted Tennessee public-records request No. 0003064 seeking the investigative report. On May 13, 2026, SCBOE denied the request, stating that the report, "if it exists," constituted attorney work product and that records concerning a sexual-harassment complaint were confidential. Plaintiff alleges that SCBOE continued to withhold the written disposition even though its retained investigator had advised her counsel that the allegations had been closed as unsubstantiated.

105. The public for-cause termination and subsequent publications have materially impaired Plaintiff's ability to obtain substantially equivalent employment. Superintendent placements at Plaintiff's level commonly proceed through recruiters, nominations, professional contacts, and confidential search discussions. Plaintiff has pursued substantially equivalent executive employment through those channels but has received no offer of substantially equivalent employment and has earned no employment income since January 21, 2025.

106. As a result of the foregoing, Plaintiff has suffered economic loss, lost wages and benefits, emotional distress, reputational harm, and impairment of future employment opportunities.

## VI. CLAIMS FOR RELIEF

### <u>COUNT I:</u>

TITLE VII – SEX DISCRIMINATION
(DISPARATE TREATMENT AND TERMINATION)
(42 U.S.C. § 2000e et seq.)

107. Plaintiff incorporates paragraphs 1–106 as if fully set forth herein.

108. Plaintiff is a female and therefore a member of a protected class under Title VII.

109. Plaintiff was qualified for her position as Superintendent of MSCS and performed the duties of that position consistent with her executive responsibilities.

110. SCBOE was Plaintiff's employer within the meaning of Title VII and was the governing body responsible for decisions concerning Plaintiff's employment, termination, severance, and employment-related benefits.

111. SCBOE subjected Plaintiff to adverse employment actions by terminating her employment for cause and denying the severance and benefits contractually available upon a termination without cause.

112. Plaintiff alleges that SCBOE treated her less favorably than male Superintendent

Dr. Joris Ray in materially relevant employment circumstances. Ray held the same Superintendent position, reported to SCBOE, and was subject to SCBOE's authority concerning investigation, continued employment, separation, compensation, and public communications. After allegations involving relationships with District employees and abuse of authority became public and an investigation began, SCBOE permitted Ray to resign and approved negotiated separation compensation and benefits. Five members of the nine-member Board serving when Plaintiff was terminated—Michelle McKissack, Joyce Dorse Coleman, Amber Huett-Garcia, Keith Williams, and Stephanie Love—also served during Ray's tenure.

113. SCBOE's handling of the allegations against Plaintiff—including the public proceedings and messaging, the failure to provide supporting evidence before requiring her response, the expansion of accusations after she responded, and the denial of severance—provides additional circumstantial evidence of discriminatory motive and pretext.

114. Plaintiff further alleges that SCBOE's disparate treatment of her was not limited to the final termination vote and that SCBOE's stated reasons for terminating her were pretextual. Among other facts, Board leadership and members of the eventual voting majority prepared termination messaging and succession plans before Plaintiff received the process offered to respond; Coleman and Murphy maintained their termination positions without meaningfully considering Plaintiff's response; additional accusations continued to be added after the termination position had formed; and materially different explanations for Plaintiff's termination were publicly offered immediately after the vote.

115. Plaintiff alleges that her sex was a motivating factor in SCBOE's decision to terminate her, deny severance and other employment-related benefits, and treat her less favorably than male Superintendent Dr. Joris Ray in materially relevant employment

circumstances. The circumstances supporting an inference of sex discrimination include that Plaintiff was MSCS's first female permanent Superintendent; SCBOE replaced her with male Superintendent Roderick Richmond; Richmond supplied Bailey with materials promoting his candidacy before the first public termination proceeding; Bailey forwarded those materials to CMG; CMG's communications plan described termination and Richmond's succession as decided outcomes; Coleman recorded termination-and-transition videos before the December 17 proceeding; Plaintiff repeatedly reported that the Board treated her differently from male Superintendent Ray; SCBOE knew of those complaints; and SCBOE subjected Plaintiff to a materially different termination process and materially less favorable separation terms than it afforded Ray. Considered together, these facts support an inference that sex was a motivating factor and that SCBOE's stated reasons were pretextual.

116. SCBOE's conduct constitutes unlawful sex discrimination and disparate treatment in violation of Title VII.

117. As a direct and proximate result of SCBOE's unlawful conduct, Plaintiff has suffered economic loss, lost wages and benefits, emotional distress, reputational harm, impairment of future employment opportunities, and other compensable injuries.

**COUNT II:**

TITLE VII – RETALIATION
(42 U.S.C. § 2000e-3(a))

118. Plaintiff incorporates paragraphs 1–106 as if fully set forth herein.

119. Plaintiff engaged in protected activity under Title VII by opposing and complaining about conduct she reasonably believed constituted sex discrimination, gender-biased treatment, and hostile working conditions based on sex.

120. Plaintiff engaged in protected opposition when, following her June 29, 2024

written complaint concerning Calvo's interference with her contractual security, she told Greene that the treatment was gender-based and contrasted it with the treatment of male Superintendent Ray; when she complained separately to Coleman and Love between September and November 2024 that Board members were subjecting the District's first female permanent Superintendent to a hostile and volatile environment, unequal scrutiny, and interference not imposed on Ray; and when she reported the same pattern to Bailey in November 2024. Greene, Coleman, Love, and Bailey occupied Board-leadership or counsel roles. Coleman acknowledged the hostile or volatile environment, Love acknowledged crossing governance boundaries and apologized for conduct Plaintiff had challenged, and Bailey told Plaintiff that Board members were concerned she might report a hostile work environment based on gender bias and discriminatory conduct. SCBOE therefore knew of Plaintiff's protected opposition before the termination proceeding began.

121. After Plaintiff began making protected complaints about discriminatory treatment in June 2024 and continued those complaints through November 2024, the effort to suspend or remove her intensified. On October 17, 2024, a proposed resolution drafted by Board Member Towanna Murphy was publicly circulated seeking Plaintiff's immediate suspension pending an investigation. Murphy testified that she discussed suspension with Board Chair Joyce Dorse Coleman to take a more "measured approach." Murphy further testified that she decided to terminate Plaintiff in September 2024 after Plaintiff did not reinstate employees whose return Murphy had demanded and the Peer Power contract nonrenewal. Coleman testified that she had decided by October that Plaintiff should be terminated. After Plaintiff's November 5 phone call with Bailey concerning protected complaints, the following day, he executed SCBOE's CMG agreement beginning termination planning and succession

communications along with Coleman and Love; Board members planned and carried out the November SchoolSeed confrontations; and CMG was preparing termination and succession communications no later than December 7, before Plaintiff received notice or an opportunity to respond. SCBOE ultimately terminated Plaintiff for cause and denied her severance. Plaintiff alleges that her protected opposition was a but-for cause of those materially adverse actions.

122. Plaintiff further alleges that SCBOE engaged in materially adverse post-employment conduct after she opposed sex discrimination. SCBOE, through its retained communications consultant, Deidre Malone, prepared and coordinated the Bush publication asserting false statements and attacking Plaintiff's professional fitness, and SCBOE's General Counsel formally defended that publication after Plaintiff demanded its removal. Plaintiff alleges that this conduct injured her professional reputation and prospects for substantially equivalent employment and would dissuade a reasonable former employee from opposing unlawful discrimination.

123. SCBOE also questioned Plaintiff during her deposition about allegations involving Camalyn Turner even though SCBOE's retained investigator, Rod Holmes, had already closed the investigation without substantiation. Immediately before a subsequent court hearing, SCBOE's attorney Jarrett Spence personally provided Plaintiff's complete deposition transcript to Daily Memphian reporter Laura Testino in the courtroom. The Daily Memphian subsequently published an online article concerning the Turner allegations and Plaintiff's deposition testimony and stated that comments were disabled "to protect the victim."

124. Plaintiff alleges that the disclosure and resulting publication renewed and amplified the unsubstantiated allegations, portrayed Plaintiff as a perpetrator despite the investigation's closure without substantiation, injured her professional reputation and

employment prospects, and would dissuade a reasonable former employee from opposing unlawful discrimination.

125. Plaintiff alleges that the timing, sequence, and continuity of the conduct described above support a causal connection between her protected opposition and SCBOE's adverse actions, and that SCBOE would not have taken those actions but for her protected activity.

126. SCBOE's conduct constitutes unlawful retaliation in violation of Title VII.

**COUNT III:**

TITLE VII – HOSTILE WORK ENVIRONMENT (SEX)
(42 U.S.C. § 2000e et seq.)

127 Plaintiff incorporates paragraphs 1–106 as if fully set forth herein.

128. Plaintiff is a female and therefore a member of a protected class under Title VII.

129. During her employment, Plaintiff was subjected to unwelcome conduct that she alleges was motivated by sex and gender bias and that interfered with her authority and working conditions as Superintendent.

130. The hostile conduct was not limited to a single meeting, a single statement, or the final termination vote. Plaintiff alleges that the hostile working conditions developed and escalated over time and included Board-level interference with Plaintiff's authority, public and private undermining of Plaintiff's leadership, public communications outside ordinary channels, the disclosure of Plaintiff's home address while she was performing District consulting and transition work, the continuing safety consequences of that disclosure during her Superintendent employment, and subsequent actions affecting her contractual security, public commentary and communications concerning Plaintiff's leadership, and the circulation, threatened use, and public use of sexualized and stigmatizing allegations concerning Plaintiff.

131. The conduct was objectively and subjectively hostile. During Plaintiff's employment, it implicated her personal safety, interfered with her contractual security, bypassed her authority, undermined her before employees and the public, impaired her ability to lead the District, and culminated in a coordinated public effort to remove MSCS's first female permanent Superintendent.

132. Plaintiff alleges that the hostile environment was based on sex. Board members repeatedly measured Plaintiff's decisions and leadership against what "Joris would" or "would not" have done and how matters had been handled when Dr. Ray was Superintendent. She repeatedly reported contemporaneously that Board members were imposing scrutiny, restrictions, and interference upon MSCS's first female permanent Superintendent that had not been imposed upon male Superintendent Ray. District staff likewise told Plaintiff that Ray had been afforded substantially greater independence with personnel decisions, financial matters, and additional areas within the authority of Plaintiff's role and contract.

133. General Counsel Bailey later informed Plaintiff that Board members themselves were concerned she might report a hostile work environment based on gender bias and discriminatory conduct. The hostility thereafter included allegations of a sexual nature directed at Plaintiff's credibility and professional fitness, while the previous male Superintendent facing serious allegations received materially different treatment. Plaintiff relies on these circumstances collectively as evidence that the hostility was not merely a governance dispute but was infected by sex-based bias.

134. Plaintiff alleges that accusations concerning dishonesty, criminal conduct, financial mismanagement, academic fraud, and credentials-related misconduct formed part of the same course of public undermining and operational interference. Plaintiff does not rely on

those accusations in isolation as sex-based harassment but alleges that they contributed to the cumulative hostile conditions when considered with the repeated male-predecessor comparisons, unequal restrictions, protected complaints, and sexualized allegations.

135. Board-member communications around Plaintiff caused District employees and external partners to question whether Plaintiff retained authority over matters assigned to the Superintendent, required Plaintiff to divert substantial time from District operations to answer public accusations and conflicting Board-member directives, and impaired her ability to direct staff through the established chain of command.

136. SCBOE knew of the hostile conditions through Plaintiff's repeated complaints to Board leadership and General Counsel. Coleman acknowledged the hostile or volatile environment. Bailey knew Plaintiff was attributing the treatment to gender bias, and Coleman advised Plaintiff that Murphy had been warned concerning her conduct. Plaintiff alleges that the reported conduct nevertheless continued and intensified and that SCBOE failed to take prompt and effective corrective action.

137. Considered cumulatively and in context, the harassment and hostile treatment were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an environment that a reasonable person would find intimidating, hostile, or abusive, and that Plaintiff in fact perceived as hostile and abusive.

138. SCBOE subjected Plaintiff to an unlawful sex-based hostile work environment in violation of Title VII.

139. As a direct and proximate result of SCBOE's conduct, Plaintiff has suffered economic loss, lost wages and benefits, emotional distress, reputational harm, impairment of future employment opportunities, and other compensable injuries.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant Shelby County Board of Education and award Plaintiff all appropriate legal and equitable relief available under federal law, including:

a. Reinstatement or, in lieu of reinstatement, front pay, together with back pay and all lost wages, benefits, and other compensation recoverable under Title VII;

b. Compensatory damages, including damages for emotional distress, reputational injury, impairment of future employment opportunities, and other compensable injuries recoverable under Title VII;

c. Declaratory relief that SCBOE's conduct violated Title VII;

d. Appropriate injunctive and equitable relief necessary to remedy the discriminatory and retaliatory employment practices established in this action;

e. Attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and any other applicable federal authority;

f. Pre-judgment and post-judgment interest as permitted by law; and

g. Such other and further relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dr. Marie N. Feagins
Plaintiff, Pro Se
110 Lee Road 573

Smiths, AL 36877
Telephone: 401-859-1443
Email: mariefeagins@gmail.com

# "EXHIBIT A"

## DECEMBER 19, 2025 EEOC EMAIL NOTIFICATION

From: **EEOC** <no-reply@service.eeoc.gov>
Date: Fri, Dec 19, 2025, 10:38 PM
Subject: Reminder: Time-Sensitive EEOC Final Decision for EEOC Charge 490-2025-02915 / Decisión final urgente de la EEOC por el cargo 490-2025-02915
To: Dr. Marie Feagins <fameuswoman@gmail.com>

## U.S. Equal Employment Opportunity Commission

The Equal Employment Opportunity Commission (EEOC) has issued a final decision regarding EEOC Charge 490-2025-02915, which can be found in the document titled **NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)** in the EEOC Public Portal. This email, as well as the NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST), is official notice that the EEOC has dismissed the above-referenced EEOC charge and that the Charging Party has the right to sue the respondent(s) on this charge in court within 90 days of receipt of this notice. The NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST) also provides additional information related to filing suit under the laws enforced by the EEOC, including important time limits. Please note that the 90-day deadline for Charging Party to file a lawsuit is set by law and failure to file a lawsuit in that time may result in the inability to move forward with a lawsuit.

**You should log into the EEOC Public Portal, download and read the NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST) as soon as possible. You should also keep a record of the date you received this notice and save the downloaded NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST).**

This email is an official notification from the Equal Employment Opportunity Commission (EEOC) regarding charge 490-2025-02915. Please do not reply to this email.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact (800) 669-4000 and destroy all copies of the original message and attachments.*

La Comisión para la Igualdad de Oportunidades de Empleo (EEOC, por sus siglas en inglés), ha emitido una decisión final con respecto al cargo de dicha Comisión 490-2025-02915, que se encuentra en el documento titulado **Notificación de Derecho a Demandar (Emitida a Solicitud de Parte)** en el Portal Público de la EEOC. Este correo electrónico, así como la Notificación de Derecho a Demandar (Emitida a Solicitud de Parte), es un aviso oficial que indica que la EEOC ha desestimado el cargo mencionado anteriormente y que la parte acusadora tiene derecho a demandar a los responsables de este cargo en un tribunal en los 90 días posteriores a la recepción de este aviso. La Notificación de Derecho a Demandar (Emitida a Solicitud de Parte) también proporciona información adicional relacionada con la presentación de la demanda bajo las leyes aplicadas por la EEOC, incluyendo límites de tiempo importantes. Por favor, tenga en cuenta que la fecha límite de 90 días para que la parte demandante presente la demanda está determinada por ley y que, en caso de no presentarla en ese plazo, podría dar como resultado la incapacidad de seguir adelante con esta.

**Debe registrarse en el Portal Público de la EEOC, descargar y leer la Notificación de Derecho a Demandar (Emitida a Solicitud de Parte) lo antes posible. Además, debería tomar nota de la fecha en la que recibió este aviso y guardar la Notificación de Derecho a Demandar (Emitida a Solicitud de Parte) descargada.**

Este correo electrónico es una notificación oficial de la EEOC relacionado con el cargo 490-2025-02915. Por favor, no responda a este correo electrónico.

*Aviso de confidencialidad: La información contenida en este correo electrónico puede contener información privilegiada y confidencial, incluida información protegida por las leyes de privacidad federales y estatales. Está destinada únicamente al uso de la(s) persona(s) nombrada(s) anteriormente. Si usted no es el(la) destinatario(a) previsto(a), se le notifica que cualquier revisión, difusión, distribución o duplicación de esta comunicación está estrictamente prohibida y puede ser ilegal. Si usted no es el(la) destinatario(a) previsto(a), póngase en contacto con el (800) 669-4000 y destruya todas las copias del mensaje original y los archivos adjuntos.*